Good afternoon. I'm Justice Aurelia Paczynski. On your screens, you'll see my colleagues, Justice Michael Hyman and Justice Mary Ellen Coughlin. You're in the First Division of the First District of the Illinois Appellate Court, and we are here today to hear oral argument on case number 1-15-1965, People of the State of Illinois v. Corey Maxfield. Will the attorney for the appellate please introduce himself? Yes, Your Honor. Hello. My name is Chris Evers. I am an attorney at the Office of the State Appellate Defender representing, of course, Mr. Maxfield. Thank you. And that would leave you, Mr. Alexander. Good afternoon, Your Honor. Assistant State's Attorney Joseph Alexander on behalf of the People of the State of Illinois. Okay. All right. Our usual rule is, you know, 15 minutes, give or take. Appellate should preserve a couple minutes for rebuttal. We try not to bother you too much, but you may find that we have some questions, and we don't really nick you on time if we're taking up a lot of time on your questions. Our advice is always to start with your best and most important point. And remember that we've read the briefs, we've read the cases cited, we've read the record, so we're familiar with things. I have to start with that. Start with your most important, best point, most winning point, and go out from there. Thank you. With that, we'll start with Mr. Evers. Thank you very much, Your Honors. Yeah, and I would like to reserve a few minutes for rebuttal, of course, if time allows me. It has taken us several years to get to this point, but now the Court finally has the information it needs to decide and rule that Mr. Corey Maxfield received ineffective assistance of trial counsel when his attorney failed to file a motion to quash arrest or suppress evidence on the evening of May 2nd when he was subject to an illegal Terry stop. This is ultimately an ineffective assistance of trial claim, and the briefing has gone into a lot of detail about how the suppression of that evidence on this meritorious motion that we've now had argued would have led to a reasonable probability of a different outcome. But I am planning to focus my argument, Your Honor, as you asked, on ultimately the inception of the stop, which is what we sent the back case for and what now we finally have the information to focus on. And ultimately, Officer Rugland did not have a reasonable article of suspicion based on the very general and limited information he knew to make the stop of Mr. Maxfield, which ultimately led to the State's two most powerful pieces of evidence, the show-off identification and the items found on his person, which was a necklace in U.S. currency. And very briefly, the facts that we have for the identification of Mr. Maxfield supposedly being one of the people the police were looking for on that evening were three generic things. First, the police were looking for two Black men. That's the only description. Where do you get the word Black? Um, that was from, well, the State's insistence on the kind of collective knowledge doctrine that the officers knew. But, I mean, he didn't know that. The officer, Robolt, he didn't know. They can rely on that, but whether it applies or not is a different issue, right? Well, yes, Your Honor, and I would be happy to say if we're just focusing on what he knows, he knew that they were looking for two people. They didn't know he was Black. You're not conceding the imputed. The collective knowledge doctrine, Your Honor? Yeah. I mean, I'm not conceding, and I'm saying that that, I'm saying it ultimately doesn't matter to a certain extent, Your Honor, that because the most general description, two men is certainly more generic than two Black men. Neither one of those descriptions get anywhere near reasonable article suspicion for the identification necessary to talk. Right. But, but for, as purpose for him, there is no transmission to him that they were, what, whether they, what race they were, was it? Correct. Nothing on the audio description play that the motion to disperse hearing identifies the race of the individuals that the police were looking for. Assuming that the collective knowledge doctrine applies, what was the information as far as the characteristics of the perpetrators of this offense? Two Black men. That's all, Your Honor. And that was, that was that based on the police officer's observations or the victims? That is based on the victims talking to the officers when they kind of ran in front of them and before the pursuit that led to the shooting and into the description. It was hard for me to record. It appeared to me that, I'm sorry, it appeared to me that one of the officers did see one of the perpetrators with a gun. Am I misreading that? No, no, you're not. I was going to do an and, Your Honor. I apologize. Yes. Obviously, the officer saw the person, the passenger that he believed was pointing a handgun at him saw a Black arm or something like that, too, and presumed that was a Black, well, not presumed, saw Black skin color and that kind of thing. But no other general description was given. No height, weight, dark, light, complexion, or any other clothing descriptions were available or given. So your position is that even under the collective knowledge doctrine, that's still not enough? Oh, not at all, Your Honor. I mean, that's, that's generic. That describes thousands of potential people in the area at the time. So that was the first of it, generic description. The second piece of knowledge is kind of the time and place of at the stop, which was coming out of an alley onto 86, the north, the southern part of the 8600 block of South Indiana. That was three blocks away from the shooting that took place three and a half, four minutes earlier, and two blocks away, being away to the east of where this minivan was abandoned in the 8600 block of South Wabash. That's the other kind of the time and place thing. So it was minutes afterwards where he saw him. And the third piece of evidence was that he saw Mr. Maxfield walking, but because he was breathing so heavily and sweaty, he had presumed that he'd been running a short time forward. Wait, wait, let's stop. You're putting a lot of things together. Let's go back a second. Of course, Your Honor. To which direction? My understanding from listening to the transmission tape was that it said eastbound or westbound. Am I wrong? No, you are 100% correct, Your Honor, is that the offenders were either eastbound or westbound. I mean, they didn't know what direction. Correct. That's everywhere. That's literally anywhere. You can only go east and west unless you literally ran up and down or down Wabash. Yes, that was all they had. Okay. Now, when you come to, let's slow down and look at the words with regard to the hearing as to what the officer saw. How far was the officer when he saw someone in the alley? How far did he describe it? He testified 25 to 40 feet when he was parked in his car. Okay. And he never described the lighting or how he, you know, how bright it was or dark, whether it's after 10 o'clock at night, right? Yes, approximately 10, 20 at night. There was no testimony of the lighting conditions at that time, Your Honor. And at that time, he also didn't testify to any heavy breathing when he saw the man, did he? He testified in cross-examination initially that he saw the man panting and sweating. He said, well, again, I mean, I can read the transcript to you, but it says that when he went to detain him, that's when he noticed the breathing. Is that right? Am I wrong? I agree, Your Honor. He testifies multiple times about the sweating. Sometimes he says, when I saw him, he also testifies once that I saw this when I made contact, which presumably is when he's been walking. When he made contact is when he saw the breathing. I mean, 20 to 40 feet, it would be amazing to hear if he could see somebody breathing. Your Honor, I don't disagree with anything that you've just said. I agree. Okay. I'm just going on what we have in the record. I'm trying to, let's slow it down and see what we have here. Of course, Your Honor. And I apologize for, I'm a fast talker and I am not trying to blow through our information here at an expediency basis. This is the, like you said, this is the crux of the case right here. Right. So, all right. So as far as the breathing is concerned, he does testify that that's when he got up close to the guy, Maxwell, that he saw that. Yes. With regard to the sweating, did he say that he saw the man sweating until he got up close or that he could see him sweating from 25 to 40 feet? Again, Your Honor, that same ambiguity to describe that. In this testimony, it says when I saw him, which by context applied when he was sitting down in his car from 25 to 40 feet away. He also then talks about, I saw this information when I contacted him. He independently described what was the more detailed sweating of seeing water going on his arms or glistening on his face and everything. That is somewhat unclear if that was from a distance or during the contact situation. But at no time did he ever say he was sweating profusely. Those words came out of the mouth of the state's attorney, didn't they? Well, there was certainly some description in saying, answering yes to questions, Your Honor. But he never said the word profusely. That was stuck into a question. Well, yes, Your Honor. You're right. He never said the word profusely. He described physically what he saw of sweat glistening on the arms and on the forehead and everything. I mean, that was something that the state's attorney said about profusely. And the judge picked up on it and uses that term many times in his ruling, didn't he? He did. And we've certainly used that throughout the entire briefing history of this case. That word has been used to describe what was going on as well. Of course, Your Honor. But it didn't come from the mouth of the police? It did not come from the officer. He described him as ultimately what he saw that led to his conclusion that he has been running at some point earlier, though how long ago that was is not known. How does he know he was running? He doesn't know. That's his assumption. And that was testimony. I mean, he was walking. He wasn't walking fast, was he? He didn't describe it as fast walking? No, it seemed as normal walking for lack of a better term, Your Honor. And he didn't try to flee or he cooperated for everything that was asked of him? Yes, he complied and did not attempt to evade or run at all. Is that indicative of some hunch? I mean, I'm trying to find out. I mean, you know, you're saying there's nothing there. Oh, I agree. There is nothing there. The officer's testimony is he stopped and detained Mr. Maxfield because he matched the description that he heard, which was... But what was the description? He didn't know what any... He said no clothing, no height, no weight. The only thing he knew is... Men. He didn't know what black men were. The males. He may know that they were males. Other than that, unless he's clairvoyant, he didn't know anything, right? I agree. And that's why there isn't reasonable, articulable suspicion. I mean, this is at most a hunch, which the Supreme Court multiple times has said is insufficient. It has to be so, you know, kind of far outside the normal. And this court alone itself has discussed in the DL case that we rely on heavily that briskly walking away or moving away from gunfire is completely normal. That's a normal response. We didn't even know if he was doing that or not. We don't. We don't know why he was glistening and why there was sweat on him, why he might have been breathing heavily or for that. But that just goes to... I'm sorry, Your Honor. I mean, we don't know. Maybe he was playing basketball. Maybe he just emptied out, cleaned out his garage. We have no idea. Nobody had any idea. The cops didn't have any idea. So a man is walking out of an alley and he's breathing heavily and he's sweating. Big deal. Probably happens a thousand times in Chicago. Again, I would agree. And I would... that's our position is that there isn't reasonable checkable suspicion, which means from the inception, this was an illegal Terry stop, which means all the evidence that flew, flowed from it should be suppressed. And that really gets into him. Mr. Waxman should be getting a new trial because the most powerful evidence the state had, of course, was the show of identification and the items found in his pockets for that. You know what? Is there anything in the record about the weather that evening? Um, my colleague who briefed this, uh, said that the average temperature based on some historical weather data for the Chicago area was 69 degrees. I have no information on localized temperature concerns at that time, Your Honor. Even 69 degrees at 10 o'clock or 11 o'clock at night. It's, it's, that's warm evening. It's warm. Yeah. May 2nd. Yeah. That's a warmer evening. You could certainly sweat by some exertion or not much exertion at all. Or if you're on some medication or whatever, some people just sweat. There's lots of possibilities, Your Honor. Yes. Which of course goes to the idea that without more than just someone was a minute and a half, two minutes later, two blocks east of a car that was abandoned isn't specific enough. It's not reasonable, articulable suspicion, which meant that this stop shouldn't have happened for that. Uh, and we've certainly talked in all the briefing DL is our strongest case, but all the cases of Washington call McClendon talk about just the general description of the individual isn't enough because at most two black men, isn't it? That's just a generic conversation that doesn't really rise enough to stop this individual. Mr. Evers, would this be a different case if the officer would have had a conversation and gotten some information from the person that was detained? I mean, conceivably, Your Honor, if you could say, Hey, are you involved? If he had gotten more are reasonable or specific things, linking him to the offenders or the people that the police were hunting over that radio, then yes, certainly. I mean, if he had said some words that suggested he had information about the event that he shouldn't have, unless he might've been personally involved, that could have possibly raised to a more reasonable, articulable suspicion, but just, Hey, I want to talk to him walking over to not trying to evade is ordinary behavior. That's not something that could have elevated this to giving the officer reasonable, articulable suspicion. I will say, Your Honor, you've asked a lot of the questions of points that I was trying to turn to get to about the details of this evidence, or frankly, the lack of detail. This is very generic. We've got a lot of case law that we discussed in our briefing that shows that this isn't enough. The fact more so that this was minutes later and that a description of East or West moving that way is literally an entire circle going out in time, like ripples. The longer the police took to stop someone farther and farther afield, individuals could have just been caught up in this randomly because moving East two minutes after this happened could be anyone on multiple blocks that could have been stopped. And it's that reason that this is not enough to stop because it's just too generic that it can sweep up literally almost anyone in that area who would have had the bad luck to have been out and stopped by the police. That happened to be Mr. Maxfield this time, but it could have been any other of the hundreds of people who lived on the blocks West and East of where that minivan was stopped on the fact that he was running. We'd be talking to the briefing. This court is held moving away from gunfire is a very normal response as well as just walking in the alley, maybe, you know, close to 87th Street, which is a major through further had restaurants and such. I know this was 1030. What day of the week was it? I couldn't figure it out. So your honor may 2nd 2012 was a Wednesday. And it was about 1030 a night, wasn't it? 10 Yeah, 1020. I think 1020 is when a lot of it started. But yeah, it's approximately 1030 in the evening. Yes. In the radio transmission. I don't even know the answer. But I was wondering, I heard there was discussion about a helicopter being up and looking for these people. Do you recall that? Honestly, I've listened to it a couple times. I don't really remember hearing any word about a helicopter. I know that none of the officers testified about using or relying on helicopter evidence or anything like that. Okay. And anything else? I mean, well, just very quickly, of course, your honor, if your honor's role in our favor that this is a meritorious motion, and all that evidence should be suppressed, because it's ineffective assistance of trial claim, the next step is to kind of see if this evidence would have result or the suppression would result in a reason probability of a different outcome. There really apparently is no dispute in my understanding in the briefing that if the motion is granted, the show goes out, the items taken from him go out. We've talked a lot about it in the briefing. So I'll just remind us that the only other evidence out there is a very kind of conflicting identification from the two victims in the robbery, because none of the circumstantial evidence, the baseball caps, the firearms that were that were linked that were found near the No person has ever testified they saw Mr. Max would even get into or out of that van. The two victims couldn't see and they only saw people of various numbers getting in and out. So our position, of course, we know whether it was a passenger or the driver. I'm sorry, I did not catch the first part of your we know whether it was the passenger in the van, supposedly, or the driver. No, no, nothing at all. No one has ever. No one saw him get out of the van. They just people. But even there's nothing in the record that because, as I understood the testimony, the officer at the scene, the person who had the firearm was a passenger. That is correct. You're on. Yes. The fire. We don't know. We don't know whether Maxfield was the passenger or the driver. No, we don't. We don't. We don't know. No one testified to where they might have been inside that car. But we don't even know if Maxfield was in the car. That is correct as well, too. No one saw him get in. No one saw him got out. And even the victims of the crime testified to different people getting out of the car. Mr. Coleman testified to two people got out. Ms. Cabrera talked about four people fled from the car when it was stopped. Maybe six South walk was. But all this goes is that the most powerful state had the show up and the items on his person with those suppressed. There's very little at all to convict, to connect him to these. And that's a reasonable problem. My last question is on the collective knowledge doctrine. Give us why that doesn't do anything. For your client, that doesn't apply or if it applies, it doesn't change the result. If it does apply, the most information it adds to what also didn't know himself personally from listening to the dispatches or what he saw with his own eyes is that it was black men. That's the only thing that adds the word that their race was black. That was not transmitted over the radio broadcast. Everything else he heard or he saw with his own eyes. That's the only thing it adds. And that certainly doesn't make it a specific enough identification to in any way justify this as a legal terrorist. Can I clarify something? Yes. You know, from reading your pleadings, it seems to me you're not arguing that it doesn't apply. You are arguing that if it does apply, it's still not enough. To our pleadings, we've never taken strong attacking on it. You're not saying it doesn't apply. You're just saying that under these facts, it's not enough. Correct, Your Honor. I mean, there's precedents for it to exist. We weren't trying to under cut the entire doctrine. It simply just doesn't matter. There's no there's nothing that it adds that is focused on the specific identification of Mr. Maxfield is one of the people they're any way preserves. This is a legal stop. Thank you. I just want to make sure I'm not misunderstanding from no, no, no, Your Honor. Okay. With that, Your Honors, that's kind of my my argument answering if there's more questions, I would happily address any of those. Otherwise, I'll reserve this small amount of time. I have a rebuttal just for a minute or two and leave you. Any other questions? No. Okay. Mr. Alexander. Good afternoon, Your Honors. Assistant State's Attorney Joseph Alexander on behalf of the people of the state of Illinois. In this case, we're asking that you affirm the trial court's denial of defendant's motion to suppress because when the this evidence is viewed in its totality, it was more than sufficient to establish that the Terry stop in this case was a valedictory stop. When we're talking about Terry, we have to be mindful of what is the purpose of Terry. The purpose of Terry is to allow officers to conduct a brief investigation to either confirm or deny a reasonable suspicion that a crime has occurred or is about to occur. Mr. Alexander, they didn't do that in this case, did they? They did, Your Honor. When we in this case, we have to, although defendant focuses solely on or strictly mainly on the defendant coming out of this office, there were things that transpired before that that gave these officers when it's taken in its totality, reasonable suspicion to this crime. What is that? These officers saw nothing. All they knew, we just heard, you disagree with what we just heard that at most, when you talk about these officers, you're talking about Bullard and his partner. Is that correct when you say these officers? I'm talking about all of the officers. Well, even if we talk all the officers, all we know is two black men, right? Well, we know more than there was two black men. We know that a serious crime had occurred. Well, that doesn't mean this man, what does it have to do with this person walking out? It all goes into the analysis of whether the officers that stopped the defendant acted reasonably. And if we look at the collective knowledge doctrine, what is known to one attributed to all of them? And in this case, what we know is that there was a serious crime that occurred. Wait, wait, wait, wait, hold up. Even the officers, officer who detained Maxfield knew that there were shots fired, correct? Correct. Okay. That's not the issue. That doesn't matter. And you know, too, I mean, this is a hard book law on Strickland, right? So you need to give me articulable, objective facts that he knew, that that officer knew that would indicate this man was involved in a crime or about to be involved in a crime. Otherwise, anyone walking in that neighborhood who happened to be a black male, you say it's your position could have been stopped. Anybody included, you know, anybody walking in that vicinity, is that the law in the United States of America? To answer your question, I think we need to take a step back. Defendant is framing this case as the police stopping it, simply stopping a black man that was walking. That is not what this case is about. That is not what happened. And to take this case out of the context of what the officers knew. We just talked about what they knew, but what did they know that was regarding this individual? They have to know something because so far you haven't given us any specifics. What the officers knew, and I'm trying to give you the specifics, what the officer knew is a crime had been committed to, there were two offenders, two offenders possibly ran either east or westbound. So we know that there are two offenders. We know that one of the offenders were described as black men. So we know the race and the gender of the offenders. We know in which direction they ran. We know that this defendant is a black man that was three blocks away from where the robbery occurred. I believe two blocks from where the minivan was stopped. We have the officer saying that he was breathing heavily. Let's slow it down because all of a sudden he's breathing heavily. You want to ask a question? I want to go back to something you said, Officer Rubal knew he was looking for a black man, but that was never in any description that he got. Well, that's based on the dispatcher. The dispatch said we have no description. Could have been looking for, you know, a white guy or Asian guy, you know. So when we look at, we're looking at the evidence known to the officers and we're looking at all of the officers. And even if we take race, even if we take race out of this, even if we take the defendant's race out of this, what is known to this officer is that there was a crime committed, there were shots fired, and there was an offender who had fled either east or westbound from the scene. And we see this defendant coming out of the alley, which is eastbound of where the offense occurred. How's he coming out of the alley? He's walking. He didn't even know that the officer was there, right? Because he's walking the alley. He doesn't try to flee, right? I mean, there's no indicia. When you look at the case law in the United States and the issues similar to this, you know, you have to have something more than a man walking. But we do have more than a man walking. What do you have that's more than him? The officer sees a man walking in the neighborhood, okay? From the direction where this crime occurred. Doesn't matter the direction. He was breathing heavily. He was sweating. Wait, wait, wait, wait. He did not know that. He even testified he did not know about breathing heavily until he got close. He says that. In his when he told him to stop. It was when he got close to him that he heard that. The only thing he talked about was possibly sweating. And even then, we have to wonder what somebody could see from 25 to 40 feet away that somebody is sweating. He never said profusely, all you have is somebody possibly sweating. And you're saying it's okay in the streets of Chicago that anyone walking in an armed robbery can be stopped. Is that your position? And if it isn't, tell me the difference. That's absolutely not my position. And we are not saying that the police... What's the difference between this case then and what you're not saying? The difference in this case and the cases that defendant is relying on is the totality of the evidence. And even though this court doesn't seem to consider, want to consider that, it needs to be considered. The law says we have to consider totality, but that is what we're doing. You haven't given us any specifics with regard to the totality, such as he was running, that he turned around when he saw the officer, when the officer said stop, that he didn't cooperate with the officer, that he threw something, you know, when he took at his pockets, he said he didn't see anything protruding, he didn't feel anything, you know, nothing out of the hand. He did it. Why did he do a pat down? Because he had heard that there were shots fired by the police officers, right? So he did a pat down. There's nothing wrong with that. Didn't find anything. What is it? Tell me, what is it that makes this circumstance different than just somebody walking down an alley at the wrong time, at the wrong street? I mean, is that it? This isn't at the wrong time, at the wrong street. What we do know is that this defendant actually committed this crime because the proceeds were found on him, and he was identified by two people. When we're talking about- No, no, no, no, no, no, no, no. You just, you're not, that's not Strickland, and you know it. I don't- I'm trying to explain our position and what our facts are, and the fact- But you can't use the facts that they took, you know, that's not- I'm not using the facts. I'm not using those- Whoa, his hunch was right, you know. I'm not using those facts to support the reasonable, articulable suspicion. What I'm saying is that in this case, as it's being framed as this person is just walking down the street as an innocent person, that's not true because of what we found after the proprietary stop. So that aside, this- Wait, no, the proprietary stop was that incident. That was the Terry stop, right? Okay, there's no two Terry stops here. He touched, he patted him down, he didn't find anything. He stopped him, all right? What we're talking about is a Terry stop. And that's what I'm trying to explain with Terry. We need to understand what Terry allows and what Terry is about. Terry is not probable cause. Terry is not- Officers don't need to know that a crime is committed. Actually, we need to look at the facts of Terry. What was the facts in Terry? An officer saw two men on a corner, saw them walking, each walking down, looking in a window, coming back, talking. They do that a few times. The officer then follows them, stops them, because based on his experience, he believes that they are casing the joint. Okay, Mr. Alexander? Yes. I understand completely what you're trying to say. And I agree with you to the extent that the collective knowledge of the police officers is something that we are required by law to consider. And there is collective knowledge in this record. However, having said that, my question to you is, based on even the collective knowledge, and you just mentioned, you know, suspicious behavior. And in this case, what suspicious behavior? Arguably, the guy's just walking down an alley and he's sweating. There was no, there were no questions posed to him. The officer didn't remember in his testimony if he had any conversation. So he doesn't testify that he's acting suspicious. I guess that we're led to conclude that, you know, sweating. And I understand this is within five minutes of a horrible crime being committed. So, you know, I'm not minimizing the facts of this at all. I'm just asking you, from where I'm sitting and reading all these cases, I'm just not sure that walking and sweating is enough. Is there anything else that I'm missing factually? Your Honor, if this were just walking and sweating, then conceivably, it wouldn't be enough, if it were just that. But, and this is why I'm trying to explain the context. It's not just walking and sweating. It's walking and sweating after these events occurred, within the time that, it's about two to five minutes after this crime occurred, within close proximity. So when you're looking at the walking and the sweating under Terry, what Terry allows is for the officers to go and conduct a reasonable, a brief investigation. And in that investigation, they can do a show up. They took this defendant. But that's my whole point. I don't see where they investigated anything. They didn't ask him any questions. The investigation, Your Honor, was taking the defendant for the show up. And I'm not going to say that we had a mound of evidence to amount of articulable suspicion to, that would be disingenuous and it's not supported by the record. But give me one, give me not a mound, give me a sliver. What I'm saying is that the evidence that we had in this case, in the context of this crime, was sufficient to allow these officers, it was the fact that this defendant was a black male sweating profusely. We don't know what that the officer said. He never said profusely. And he did say that he didn't see the sweat until he got up close. So again, that is what his testimony was. This officer never heard the word black. It was not in any of the dispatches. He never heard that word. Never heard it. So he saw a man coming, walking out of an alley. That's it. That's what he saw. I want to ask you a question that I asked the counsel. In the transcript of the conversations, it says the dispatcher asked, what do you need? In the response, you get the helicopter up. In the response, with helicopters overhead, we need a perimeter. Why was there a helicopter on a $200, about $200 in a chain? I can't, unfortunately, your honor, I can't answer that question. I can't explain why the police Is that normal? Honestly, I can't even say what is normal in those situations. I'm not privy to police procedure on when a helicopter can be used. All I can say is, based on our interpretation of the law, based on our review of the facts and the totality of the facts, including what occurred before this defendant was stopped, we believe that the what Terry allows them to do, which is to conduct a brief investigation. And in this case, Terry is especially relevant, the idea that officers can conduct this brief investigation, because what we were dealing with was an armed person who had no trouble pointing a gun at victims taking their property and then pointing that gun at police officers that require the defendant out of fear of their safety. What Terry allows for these brief investigations. Excuse me, counsel. We don't know that this is the guy with the gun. Nobody said this is the guy with the gun. And that's a reason why this, why Terry does allow officers to conduct the investigation, because if he wasn't the guy with the gun, if he wasn't the guy with the involved, when they get to show up, now we can let this innocent person go and continue our investigation. Terry is not probable cause. Terry is reasonable suspicion. And we have to take into consideration the officer's experience and what is known and not. This isn't a case of the. Where's the testimony about his experience in the record? Well, the officer testified that he had been an officer, I believe at the time, 12 years at the time of the motion. So 12 years experience. At the time, are you sure about it? There were two officers testified and I couldn't be getting there. The officer, I'm sorry, 19 years at the time of the motion. And that's on the page. Page 83. Yes. I'm looking at. I don't R83. I don't see that. It's R82. It's the question was, how long have you been a Chicago police officer? And the response was 19 years. So it was not 19 years in 2012. It was, I said 19 years at the time of the motion. At the time of the motion. So that's, so in 2012, less than 10. So he had 10 years experience at the time of the motion. We don't know anything else besides that. As a patrolman, which is similar to what the officer in the actual Terry case said. He was basing it on his experience of seeing people, looking at people, talking to people, seeing these two men walking down, looking in a window. Where does this officer say he based it on his experience? Well, this is an inference that can be made from the record, right? Every police officer, we should make that. You're saying just because the police officers with a department number a year, we should always make that. That's an inference. I'm not saying that. I'm saying that it's an inference that can be made that this officer has sufficient experience to make this evaluation. Well, if that was true, then we should have been asked about it, but he wasn't. Again, I wasn't the trial attorney. All I'm able to do is argue the facts and the facts of this case, the totality of them, all of the facts, not just the defendant walking out of the alley was sufficient to allow this officer to briefly detain this defendant, to conduct a show up, to determine as whether this defendant was involved in the crime as a matter of public safety when we have the possibility of firearms being used in crime. So you're saying the city of Chicago, anyone walking within a vicinity of an armed robbery can be stopped. That's not what I'm saying. But it is what you're saying. It's absolutely not what I'm saying. It's what I'm saying is when the officers have facts that support that stop, which in this case are the facts that occurred before the stop and the facts that the officer. But be specific because all we know is two black men to use the most generous description. And this person happened to be black walking. But what is that to tell people in the city of Chicago that if you're in a neighborhood that there's an armed robbery, anyone who's a black male and if the word goes out there were black males, any black male can be stopped because we don't know height. We don't know weight. We don't know what they're wearing. We don't know anything. And all he was doing was walking. He wasn't running. He wasn't fleeing. He didn't look suspicious. He didn't say anything suspicious. There was nothing. And yet you say that in the city of Chicago, somebody can be stopped for that. Is that your position? Mr. Alexander, I do not think that is your position. But I also would like to point out the fact that unfortunately, I'm troubled by the lack of information elicited from this person at the hearing concerning the facts of what actually happened. I have a real problem with that. And I understand that that is not your position and you're arguing collectively what they knew. But what they knew, I find some problems with. And I think really that stems from the lack of questions that were asked of this officer at the hearing. We don't know why he suspected. We don't know if he thought that this was suspicious. We don't know if he asked him, what are you doing there? Because he doesn't remember either. Maybe because it was so long between the facts of what happened and this hearing. Your Honor, I appreciate that. And I understand that. And I take this as, as I do all oral arguments, as a lesson, a learning experience. And I can relate this to our trial essays on how to better prepare a record. Unfortunately, I am. I'm not asking you to do that. I'm just saying from my perspective. But it's something that needs to be done in order to make sure that we are doing justice for the victims and for the defendants, because we are responsible for ensuring that they receive a fair trial. And it is our position that even though the facts in this case aren't as developed as might have been, there's enough here when we are looking at everything that is known to the officer to justify the brief detention. I am not suggesting that the police can stop anybody in an area where a crime has been committed. I'm saying that based on what was known, even in that limited nature about the defendant being a eastbound or westbound being a black male and the officer's observation of the defendant's brief under Terry to briefly detain this defendant to conduct further investigation, not saying that this was enough to arrest the defendant or any other thing other than that brief Terry stop. And if there are no further questions, I think. I don't have a further quick, but I do want to say that I think you have a tough case and you did a very good job for your client. So I want to compliment you and your professionalism. And I asked a lot of tough questions. I know that. And I wanted to see how far you would go, which I can do. And you handled it excellently. So I appreciate that. Again, as I said, we are limited with what we have, but I understand. It's not you. I'm not talking about you personally. Just so you know, you did a great job. So the other counsel, you're both doing a good job with a difficult. And I appreciate that, Your Honor. And if there are no further questions for the reasons stated here and in our brief, we ask that you affirm the trial court's denial of the motion to suppress any of the questions. Okay. Yeah, two very short points in rebuttal about 30 seconds, Your Honor. First, any suggestion that the information that we want to suppress, the proceeds found or anything found after the inception of the illegal Terry stop cannot be considered on whether it's reasonable to kind of claw back in time. It was reasonable at its inception. Any suggestion that that's appropriate is incorrect under Terry v. Ohio. And second, to the extent that Terry v. Ohio was being an analogy. In Terry, there was no question about what he thought might have been casing the point. He was not confused about who he'd be focusing on. This is an identity case. And the idea that someone can just be walking and sweating, and that's enough. There is no case in Illinois that I've looked that talks about merely walking and sweating. The few cases that talk about it have other specific information that points to that specific individual who happens to be sweating is the person who was fleeing from a crime scene. We have nothing that here and to expand it would make it an ordinary behavior so broad that it would almost justify any kind of Terry stop. And that's not what the case law has consistently held is appropriate. That is all, Your Honors. Thank you for your time. And please, we ask that you reverse Mr. MacDill's conviction. Thank you very much, gentlemen. I'd like to thank you for your excellent groups and excellent argument. We will take all of this into consideration and come up with a order or an opinion forthwith. And this court is adjourned. Thank you.